SCOTT M. LOFTIN and JOHN W. MARTIN, as Trustees of the property of the Florida East Coast Railway Company, a corporation, v. MADELYN SAXON, as Administratrix of the Estate of G. M. Saxon, Deceased.

35 So. (2nd) 716                                    January Term, 1948
June 1, 1948                                                 En Banc
Rehearing denied June 15, 1948

*Russell L. Frink, Samuel Kassewitz* and *William J. DeHoff,* for appellants.

*Bedell & Bedell* and *T. J. Lewis* (Atlanta, Georgia) for appellee.

SEBRING, J.:

The appellants maintain and operate a railway switch yard at New Smyrna, Florida, in connection with their interstate commerce transportation movements. Five of the switch tracks numbered 1 to 5, inclusive, and known as the West Yards, lie west of and parallel to the southbound main line of the appellants. Certain switch tracks known as the East Yards lie east of and parallel to the northbound main line of the appellants. Immediately to the west of Track No. 5, West Yards, the Fruit Growers Express Company maintains and operates an office from which it transacts its business in connection with shipments of commodities loaded into its refrigerated cars and transported from New Smyrna over the railway lines of the appellants.

G. M. Saxon was a member of a switching crew employed by the appellants. The crew consisted of yard foreman, Eugene White, an engineer, a fireman, and two switchmen including Saxon. On the morning of October 29, 1945, Saxon was killed by being struck by Engine No. 309 which was being operated by the appellants on Track No. 1, West Yards. At the time of his death only two engines were in operation in the yards—Engine No. 309, which had just come from the repair shops after an extensive overhaul, and Engine No. 268 which was being operated by the crew of which Saxon was a member.

Some few minutes prior to his death Saxon had been sent by yard foreman White from the east side of the East Yards to the office of Fruit Growers Express Company to ascertain

whether certain refrigerated cars were ready for moving. In order to reach the office Saxon had to cross over the East Yard Tracks, the two main line tracks, and the five tracks of the West Yards, all of which ran in a northerly and southerly direction. While he was engaged in this errand, Engine No. 268, which was headed north, was backing south on the Southbound main line track, pulling ten or eleven tank cars behind it. In the meantime, Engine No. 309 was being "broken in" on Track No. 1, West Yards, by its crew consisting of an engineer and fireman. The "breaking in" process consisted of running the engine back and forth along the track for eight hour periods until the new parts with which it had just been repaired had become properly adjusted and were in smooth running order.

When Saxon first went across the tracks to the office of Fruit Growers Express Company, Engine No. 309 was completing a run to the south end of the West Yards and was some three thousand feet or more south of the point where Saxon crossed over. After finishing with his errand Saxon recrossed four of the West Yard Tracks and came to a pause upon Track No. 1 West Yards. There he stood on the east end of a tie for about 30 seconds, for the apparent purpose of waiting for the tank cars being pulled by Engine No. 268 southward to pass by him on the Southbound Main Line Track, and then of continuing on across the yards to where Yard Foreman White was standing.

While Saxon was standing on Track No. 1 West Yards he was struck by the tender of Engine No. 309 which had returned from its trip to the south end of the yards and was backing in a northerly direction. Saxon was thrown to the tracks and the engine passed over him, killing him instantly.

Mrs. Madelyn Saxon, the personal representative of the estate of the decedent, brought suit for damages against the trustees of the railway company, in an action instituted under the Federal Employers Liability Act. The amended declaration upon which the trial was had contained a general allegation of negligence to the effect that Saxon, the deceased employee, "was negligently run into, stricken, knocked down, run over and instantly killed by an engine of the defendants

then and there being operated over said track by their agents, servants and employees." It also contained specific allegations of negligence to the effect that the engine which struck Saxon was being operated at a negligent rate of speed; that defendants' employees in charge of the engine negligently failed to ring any bell, blow any horn or whistle, or give Saxon any notice or warning of its approach; and that said employees on said engine negligently failed to keep a proper look-out and negligently failed to apply the brakes and stop the engine before running over Saxon.

The defendants filed a plea of not guilty to the amended declaration and the parties went to trial. The jury returned a verdict in favor of the plaintiff in the amount of $25,000. Subsequently, a motion for new trial filed by defendants was denied and a judgment was entered in favor of the plaintiff for the amount awarded by the jury. The defendants have appealed from the judgment and ask for a reversal of the judgment on the ground that the trial court committed reversible error (1) in refusing to grant the defendants' motion for directed verdict made at the close of the plaintiff's case in chief, (2) in refusing to grant the defendants' motion for new trial filed after verdict, and (3) in refusing to give certain instructions to the jury at the request of the defendants.

The Federal Employers Liability Act, under which the suit was instituted, provides that every common carrier engaged in interstate commerce shall be liable in damages to any person suffering injury while employed by such carrier in such commerce, or, in case of death, to the personal representative of such employee for the benefit of the surviving widow and children of such employee, "for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier." It provides, also, that in all actions brought under the Act "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee;" and that in any such action "such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in

whole or in part from the negligence of any of the officers, agents or employees of such carrier." See Federal Employers' Liability Act, Sections 51, 53, and 54, Title 45, U.S.C.A.

The primary question in the case is whether the death of Saxon resulted "in whole or in part from the negligence of any of the officers, agents or employees of [the] carrier," by which he was employed, as charged in the declaration, or whether Saxon came to his death solely through his own negligence.

Our conclusion upon this question is that while the evidence as to what transpired immediately prior to and at the time Saxon was struck by Engine No. 309 was conflicting, there was sufficient evidence submitted to authorize a finding by the jury that the death of Saxon resulted, in part, at least, from the negligence of the employees of the railway company by which he was employed, either in the operation of Engine No. 309 at a negligent rate of speed under the circumstances; in the negligent failure of the crewmen of Engine No. 309 to warn the decedent of the approach of the engine; or in the negligent failure of the crewmen of the engine to keep a proper look-out or to apply the brakes and stop the engine before running over Saxon.

Succinctly stated, there was evidence, if the jury saw fit to believe it, that upon its return run northward on Track No. 1, West Yards, Engine No. 309 was being operated at an estimated speed of 20 or 25 miles an hour, when a much less speed would have been ample for "breaking in" the engine; that the tracks were straight, the day was clear, and the grade was level; that the engineer of Engine No. 309 saw Saxon come on to Track No. 1 when the engine was at least 1000 yards from him; that Saxon then passed out of the line of vision of the engineer, yet the engineer did not slacken speed or make any effort to determine whether or not Saxon had stopped on Track No. 1 to await the passing of Engine No. 268 on the Southbound main line track or had stepped eastward into the narrow space intervening between Track No. 1 and the Southbound Main Line Track on which Engine 268 was approaching Engine No. 309; that when Saxon passed out of the engineer's line of vision, the latter did not blow his whistle, or make the slightest effort to determine from his fireman, who was on the

opposite side of the cab, whether Saxon had remained on the track or had continued on across it out of danger. There was evidence that as Engine No. 309 was approaching Saxon the fireman was in his seat, was looking northward along the track, and could and should have seen the decedent in ample time to have warned the engineer that Saxon was standing on Track No. 1 apparently oblivious of the fact that the engine was bearing down upon him. There was evidence from the fireman of Engine No. 268, which had just passed Saxon as it went southward on the Southbound Main Line Track, that he saw Saxon standing on Track No. 1 and sensing that he was unaware of the approach of Engine No. 309 sprang to the engineer's side of his cab and blew the engine whistle one sharp blast (which was a danger signal requiring all engines in motion to come to an emergency stop), and that after blowing the whistle he returned to his own side of the cab and observed that the tender of Engine No. 309 was still some 30 yards south of Saxon and that no apparent effort had yet been made by the crewmen of Engine No. 309 to bring the engine to a stop or to otherwise prevent a collision with Saxon or to warn him of its presence. There was also evidence that after Engine No. 309 struck Saxon it traveled northward some 180 feet before coming to a full stop.

From this evidence the jury was within its lawful rights in concluding that the crewmen of Engine No. 309 were negligent in the premises, and that the material allegations of the declaration had been proven.

That Saxon was guilty of contributory negligence in not observing the approach of Engine No. 309 in time to move out of its path, there can be no doubt, but his was not the sole negligence in the matter and consequently his contributory negligence did not bar the right of recovery but was a factor to be considered by the jury only upon the question of diminution of damages.

The jury awarded the personal representative of the estate of the decedent in the sum of $25,000 for the benefit of the decedent's widow, who was his sole dependent. Taking into consideration the age of the decedent, his life expectancy, and

other essential factors to be weighed by the jury, it is our view that the award made by the jury was not excessive.

The appellants have assigned error with respect to the failure of the trial judge to give certain charges requested by them. In the light of the charges which were given by the trial judge, we are unable to find that the refusal to give the requested charges constituted reversible error.

Other questions raised on the appeal have been duly considered and we find them to be without merit.

From the conclusions we have reached, we are of opinion that the judgment appealed from should be affirmed.

It is so ordered.

TERRELL, CHAPMAN, ADAMS, and BARNS, JJ., concur.

THOMAS, C. J., dissents.